# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| ANTHONY C. JOHNSTON, | * |
| | * |
| Plaintiff, | * |
| | * |
| vs. | * CIVIL ACTION NO. 12-00601-B |
| | * |
| CAROLYN W. COLVIN,[1] | * |
| Commissioner of Social Security, | * |
| | * |
| Defendant. | * |

## ORDER

Plaintiff Anthony C. Johnston (hereinafter "Plaintiff") brings this action seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for child's insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, and 1381, *et seq.* On October 7, 2013, the parties consented to have the undersigned conduct any and all proceedings in this case. (Doc. 16). Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. A hearing was conducted in this matter on November 25, 2013, before the undersigned Magistrate Judge. (Doc. 23). Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED.**

**I.    Procedural History**

Plaintiff filed an application for child disability benefits and supplemental security

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d), Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

income ("SSI") on May 5, 2009, and alleged that his disability commenced on August 2, 1995, when he was five years old.[2] (Tr. 174-180). Plaintiff's applications were denied at the initial stage on July 24, 2009. (Id. at 87-89). He filed a timely Request for Hearing, and on October 13, 2010, Administrative Law Judge David Murchison (hereinafter "ALJ") held an administrative hearing, which was attended by Plaintiff and his mother, both of whom provided testimony, and Plaintiff's attorney. (Id. at 46, 63). A medical expert ("ME") and a vocational expert ("VE") also appeared at the hearing and provided testimony. (Id. at 59, 69). On October 26, 2010, the ALJ issued an unfavorable opinion finding that Plaintiff is not disabled. (Id. at 25, 41). The Appeals Council denied Plaintiff's request for review on July 24, 2012. (Id. at 1). Thus, the ALJ's decision dated October 26, 2010, became the final decision of the Commissioner. Having exhausted his administrative remedies, Plaintiff timely filed the present civil action. (Doc. 1). The parties agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

**II.     Issues on Appeal**

     A.    Whether substantial evidence supports the ALJ's RFC assessment?

     B.    Whether the ALJ failed to pose an adequate hypothetical question to the vocational expert?

**III.    Factual Background**

Plaintiff was born on September 22, 1989, and was twenty-one years old at the time of his administrative hearing. (Tr. 50, 177). Throughout Plaintiff's academic career, he was enrolled in special education classes. (Id. at 215, 224). At the time of the hearing, he had not graduated from high school but was enrolled in a high school vocational program to learn to

---

[2] Plaintiff has filed multiple prior applications for child disability benefits and SSI, all of which have been denied. (Tr. at 25, 83-86).

weld. (Id. at 50-52, 258). He has no past work experience. (Id. at 58).

Plaintiff testified at the hearing that he reads on a third grade level and that filling out a job application is difficult. (Id. at 50, 54-55). He stated that welding does not require reading and is "pretty much hands-on." (Id. at 53). He testified that there are about thirteen or fourteen other students in his welding class, and they all "do about the same work, [at] about the same pace." (Id. at 53-54). He stated that he has no problems with absenteeism or with the class but that he did not successfully reach the "pipe weld" level the first year and had to repeat the class. (Id. at 56, 58). Plaintiff also testified that he "live[s] in a real country place," where there are very few jobs available. (Id. at 57).

With respect to his activities of daily living, Plaintiff testified that he drives;[3] he does normal chores; and he has a girlfriend who helps him with his school work. (Id. at 52-53, 55). He stated, "I just don't read."[4] (Id. at 55). In his Function Reports, Plaintiff stated that he has no problem taking care of his own personal needs and that his hobbies are "hang[ing] out" with others, riding four-wheelers, and working on four-wheelers. (Id. at 225-26, 229, 254). He stated that he cannot count money and that he has trouble following instructions, which makes him angry and frustrated. (Id. at 228, 255).

At the time of the hearing, Plaintiff had been diagnosed with borderline intellectual functioning, development disorder (reading), and attention deficit hyperactivity disorder ("ADHD"). (Id. at 63-64, 68, 274, 330). He testified that he has no physical problems and is not taking any medication. (Id. at 59).

Plaintiff's mother, Ms. Donna Dougherty, testified at the hearing that Plaintiff took

---

[3] Plaintiff stated that he can drive, but he cannot read road signs. (Tr. at 228).

[4] Plaintiff stated in his Disability Report that he cannot work because he has a "learning disability" and "can't read or write." (Tr. at 204).

3

Adderall for his behavior when he was eleven years old. (Id. at 63-64). He stopped taking it because it made him feel "sick" and unable to function. (Id. at 64).

Dr. John Davis, Ph.D., a non-examining medical expert, testified at the hearing that Plaintiff has been tested several times, that his IQ appears to be between 65 and 70, and that he "seems like a high-functioning person." (Id. at 60). Dr. Davis agreed with the diagnosis made by examining consultative physician, Dr. Nina Tocci, Ph.D., that Plaintiff has "borderline intellectual functioning," and he stated that, consistent with that diagnosis, Plaintiff would benefit from supervision and advice with matters such as medical decisions and his finances. (Id. at 68-69). Dr. Davis stated that at a third grade reading level, Plaintiff is considered "functionally illiterate." (Id. at 69).

## IV. Analysis

### A. Standard of Review

In reviewing claims brought under the Act, this Court's role is a limited one. The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[5] Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla, but less than a preponderance" and consists of "such relevant

---

[5] This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

4

evidence as a reasonable person would accept as adequate to support a conclusion."). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

B.  **Discussion**

An individual who applies for Social Security disability benefits must prove his disability. 20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven his disability.[6] 20 C.F.R. §§ 404.1520, 416.920.

---

[6] The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. Id. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

**1. ALJ's Decision**

In the case *sub judice*, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since August 2, 1995, the alleged onset date, and that that he has the severe impairments of borderline intellectual functioning and development disorder. (Tr. at 28). The ALJ further found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 32).

The ALJ concluded that Plaintiff has no past relevant work, and that he has the residual functional capacity (hereinafter "RFC") to perform a range of work at all exertional levels, with the following non-exertional limitations: Plaintiff is limited to understanding, remembering, and carrying out simple one and two-step instructions on a frequent basis, and he is limited to only occasional interaction with the general public. (Id. at 36, 39). The ALJ found that taking into account Plaintiff's RFC for a range of work at all exertional levels, as well as his age, education, work experience, and the testimony of the VE, Plaintiff can perform the requirements of representative unskilled occupations such as "bus cleaner" (DOT #919.687-014), "potato chip sorter" (DOT #526.687-010), "hay sorter" (DOT #732.686-010), and "farm worker" (DOT #409.686-010).[7] (Id. at 40). Thus, the ALJ concluded that Plaintiff is not disabled. (Id.).

**2. Record Evidence**

**a. Academic Evidence**

Plaintiff's school records show that in April 2003, when he was thirteen years old and in the sixth grade, he was referred for special education testing and was given the Universal Nonverbal Intelligence Test (UNIT). Plaintiff obtained a Memory Quotient score of 76, a

---

[7] The vocational expert testified that these jobs are not affected by functional illiteracy. (Tr. at 77).

Reasoning Quotient score of 66, a Symbolic Quotient score of 58 ("very delayed"), a Non-symbolic Quotient score of 85 ("low average"), and a Full Scale score of 67 ("very delayed").[8] (Id. at 266, 268, 276-77). As a result of the testing, the examiner determined that Plaintiff had "specific learning disabilities" that qualified him for special education services. (Id. at 268).

At the time that Plaintiff filed his application for disability benefits in May 2009, he was nineteen years old and in the eleventh grade at Washington County High School. (Id. at 215). On May 12, 2009, Plaintiff's teacher, Ms. Tarver, completed a Teacher Questionnaire in which she noted that Plaintiff was receiving special education services and that his reading, math, and written language skills were below grade level. (Id.). She noted no problems with absenteeism. (Id.). In the questionnaire, Ms. Tarver commented that Plaintiff "receives services daily from the resource teachers;" that "[m]ost assignments [and] tests are modified so that he can better complete the task;" that [h]e is dependent on the resource teachers to read necessary information to him;" and that [w]ithout the opportunity to hear information, he has trouble completing [the] task." (Id. at 216-17). In rating his abilities in the six domains of functioning, Ms. Tarver found Plaintiff to have only slight or no problems with interacting and relating with others, moving about and manipulating objects, caring for himself, and health and physical well-being. (Id. at

---

[8] The report from the 2003 UNIT test stated that Plaintiff's score of 85 on the Non-symbolic Quotient scale indicated "significant strength" in this sub-domain which measures "perception, cognition, sequencing, organization and integration and encompasses all aspects of cognition including reasoning and memory." (Tr. at 277-78). The examiner noted, "[t]his is the mortar of intelligence." (Id. at 278). The examiner also noted "cognitive weakness" expressed by the Plaintiff's score of 58 on the Symbolic Quotient scale. The Symbolic Quotient scale measures "the ability to understand and process language," which is "critical for academic and social success." (Id. at 278). The examiner noted that these are "the building blocks of intelligence." (Id.). The examiner ruled out mental retardation as the primary cause of Plaintiff's impairment. (Id.).
　　As discussed, *infra*, Plaintiff was retested in January 2009 by consultative examiner, Dr. Nina Tocci, Ph.D., using the Wechsler Adult Intelligence Scale (WAIS-IV) test, and he achieved a Full Scale IQ score of 70. (Id. at 290-91).

218-21). However, she found six serious and three very serious problems in the domain of acquiring and using information and one serious and two very serious problems in the domain of attending and completing tasks.[9] (Id. at 216-17).

In May 2008, an Individualized Education Program (IEP) team determined that Plaintiff continued to have specific learning disabilities and continued to be entitled to special education services. (Id. at 224). In August 2010, Plaintiff's IEP report showed that he was a senior at Washington County High School who was at risk of aging out of the school system before receiving enough credits to obtain his diploma.[10] (Id. at 258). The team noted that Plaintiff had a "reading disability that affect[ed] all areas of his learning" and that his teachers gave him accommodations, including reading tests orally to him and giving him extra time to complete his work. (Id.). The team further noted that he was conscious of his low reading level, that he was easily frustrated, and that one-on-one instruction and small group was the best way for him to learn. (Id.). According to the report, although Plaintiff had not passed all of the requirements of the Alabama graduation examination, he was a candidate for the Alabama Occupational Diploma. (Id.). In addition, the report noted that Plaintiff did not have behavior problems which impeded his learning; he did not have limited English proficiency; he did not have communication needs; he did not need specially designed P.E.; and he did not need assistive

---

[9] Ms. Tarver found that Plaintiff had "very serious" problems in the areas of reading and comprehending written material, expressing ideas in written form, learning new material, completing work accurately without careless mistakes, and working at a reasonable pace/finishing on time. (Tr. at 216-17). He had "serious" problems in the areas of understanding vocabulary, comprehending and doing math problems, participating in class discussions, providing organized oral explanations, recalling and applying previously learned material, applying problem solving skills in class discussions, and completing class and homework assignments. (Id.).

[10] The IEP report indicated that Plaintiff had quit school for two years and had to make up the courses that he had missed. (Tr. at 258).

8

technology devices or services. (Id. at 259).

### b. Medical Evidence

The relevant medical evidence in this case reflects that in September 2005, Plaintiff sought treatment from Dr. James Hassel for reflux and right knee pain. (Id. at 281). Dr. Hassell prescribed Prevacid for reflux and referred Plaintiff to an orthopedist, Dr. John McAndrew, for his knee problems. (Id. at 281, 287). Plaintiff reported to Dr. McAndrew that he was experiencing "off and on" knee pain when running and playing sports. (Id. at 281). X-rays of Plaintiff's knee were "normal," and Dr. McAndrew recommended that Plaintiff wear a brace and do exercises for quadriceps strengthening.[11] (Id.). In May 2006, Plaintiff returned to Dr. Hassel for treatment of "mild" right wrist strain after running a chain saw for three days. (Id. at 286). Plaintiff returned to Dr. Hassell in September 2007, for a leg burn from a motorcycle and again in September 2008, for treatment of a BB that was lodged under his skin. (Id. at 282-83, 285).

On July 20, 2009, when Plaintiff was nineteen years old, the Agency referred him to Dr. Steve Furr for a consultative physical examination. Plaintiff reported to Dr. Furr that he had always been in special education classes, that he had difficulty reading even a very simple sentence, that he expected to graduate the following year, that he had no medical problems, that he took no medications, and that he had no problems sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, or traveling. (Id. at 326). Upon examination, Dr. Furr noted that Plaintiff was well nourished, that he was well developed, and that he communicated clearly. (Id. at 327). In addition, Dr. Furr's examination findings were all normal and revealed no physical problems whatsoever. (Id. at 327-30). The foregoing medical records represent all

---

[11] Four years later, on July 24, 2009, State Agency physician Dr. Russell March reviewed Plaintiff's medical records and opined that Plaintiff's right knee problems were not severe. (Tr. at 335).

9

of the medical evidence related to Plaintiff's treatment and evaluation for physical illnesses or injuries.

With respect to Plaintiff's mental health treatment, the record shows that on April 1, 2002, when Plaintiff was twelve years old, he was evaluated at Altapointe Health Systems and diagnosed with attention deficit hyperactivity disorder ("ADHD"). (Id. at 274). There are no further records related to his treatment for any mental health condition.

On January 22, 2009, the Agency referred him to Dr. Nina Tocci, Ph.D., for a consultative psychological exam. (Id. at 290). Plaintiff reported to Dr. Tocci that he was seeking disability benefits because "[he] can't read." (Id.). Plaintiff told Dr. Tocci that he was not taking any medications and that he had not received any treatment for any mental health issues. (Id.). Plaintiff reported that he planned to become a welder after high school. (Id.). Dr. Tocci noted that Plaintiff's appearance, grooming, posture, and gait were normal and appropriate, that he had good eye contact, that his facial expressions were responsive, and that he had a cooperative attitude. (Id.). Dr. Tocci noted some difficulty with his speech but indicated that chewing gum may have been a factor. (Id. at 291). Dr. Tocci's treatment notes reflect that Plaintiff's mood and affect were normal and appropriate, that he was oriented to time, place, person, and situation, that he demonstrated focused attention and concentration, that his thought content was normal, appropriate, and logical, that he demonstrated some insight into his behavior and fair social judgment but that that he had a poor fund of information, and his ability to think abstractly was limited. (Id.).

Plaintiff reported to Dr. Tocci that his daily activities included school, sitting around the house, playing card games alone, watching television, doing chores, driving, going to church, fishing, going to movies, and socializing with friends. Plaintiff stated that he performed his daily

activities without assistance.  (Id.).

Dr. Tocci also tested Plaintiff using the Wechsler Adult Intelligence Scale (WAIS-IV). Plaintiff achieved a Verbal Comprehension score of 70, a Perceptual Reasoning Score of 77, a Working Memory score of 71, a Processing Speed score of 81, and a Full Scale score of 70. (Id.).  Dr. Tocci diagnosed Plaintiff with "borderline intellectual functioning," noting that his prognosis is "guarded."  (Id. at 292).  Dr. Tocci noted that the results of previous testing in 2003 indicated test scores within the mentally retarded range of intellectual ability, with academic achievement in the impaired range.  (Id.).  However, she opined that Plaintiff is "functioning within the borderline range of ability" and "appears to have some ability to learn simple tasks and to perform them in a timely manner with supervision."  (Id.).

On February 4, 2009, State Agency psychologist Dr. Donald Hinton, Ph.D., completed a Psychiatric Review Technique opining that Plaintiff has "borderline intelligence" which causes moderate limitations in the area of maintaining concentration, persistence or pace, but only mild limitations in his activities of daily living and social functioning and no episodes of decompensation.  (Id. at 295, 304).  Dr. Hinton also completed a Mental RFC Assessment in which he opined that Plaintiff is "moderately" limited in three of the twenty functional categories (*i.e.*, ability to understand and remember detailed instructions, ability to carry out detailed instructions, and ability to maintain attention and concentration for extended periods.).  (Id. at 308).  Dr. Hinton found that Plaintiff is "not significantly limited" in any of the remaining seventeen functional categories.  (Id. at 308-09).

On June 24, 2009, State Agency psychologist Dr. Linda Duke, Ph.D., completed a Psychiatric Review Technique and opined that Plaintiff has "borderline intellectual functioning and development disorder, read[ing]," which causes moderate limitations in the areas of

11

maintaining social functioning and maintaining concentration, persistence or pace, mild limitations in his activities of daily living, and no episodes of decompensation. (Id. at 313, 322). Dr. Duke also completed a Mental RFC Assessment on July 23, 2009, in which she opined that Plaintiff is "moderately" limited in four of the twenty functional categories (*i.e.*, ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, and ability to interact appropriately with the general public). (Id. at 331-32). Dr. Duke found that Plaintiff is "not significantly limited" in any of the remaining sixteen functional categories. (Id.). Dr. Duke opined that Plaintiff is "able to understand, remember and to carry out short and simple instructions," that Plaintiff is able to concentrate and attend for reasonable periods of time, that Plaintiff's contact with the general public should be infrequent, and that Plaintiff has no significant restrictions in the area of adaptation. (Id. at 333).

**3. Issues**

**a. Whether substantial evidence supports the ALJ's RFC assessment?**

In his brief, Plaintiff argues that the ALJ's determination that he has the residual functional capacity to perform a range of work at all exertional levels (as long as that work is limited to understanding, remembering and carrying out simple one and two-step instructions on a frequent basis and only occasional interaction with the general public) is not supported by substantial evidence. (Tr. at 36). Specifically, Plaintiff argues that the ALJ erred in affording significant evidentiary weight to the opinion of non-examining State Agency psychologist, Dr. Linda Duke, and in concluding that Dr. Duke's opinion was consistent with the report of examining psychologist, Dr. Nina Tocci, Ph.D., as well as the report of Plaintiff's teacher, Ms. Tarver. (Doc. 13 at 2-3, 7-8). The Government counters that the ALJ's RFC assessment is

supported by substantial evidence and that it is consistent with the opinions of all of the examining and non-examining physicians who evaluated Plaintiff, as well Plaintiff's teacher's report. (Doc. 14 at 7-8).

The undersigned observes, as a preliminary matter, that an ALJ is "required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.'" Milner v. Barnhart, 275 Fed. Appx. 947, 948 (11th Cir. 2008) (unpublished) (quoting 20 C.F.R. § 404.1527(f)(2)(i)). Further, "[t]he ALJ may rely on opinions of non-examining sources when they do not conflict with those of examining sources." Id. (citing Edwards v. Sullivan, 937 F.2d 580, 584-85 (11th Cir. 1991)).

A review of the record in this case demonstrates that while Plaintiff claims that the ALJ erred in assigning "significant evidentiary weight" to the findings and conclusions of State Agency psychologist Dr. Duke,[12] Dr. Duke's opinions are actually consistent with the other medical evidence of record. For example, Dr. Tocci, the examining psychologist, opined that Plaintiff had some ability to learn simple tasks with supervision. This opinion is consistent with Dr. Duke's opinion that Plaintiff is able to understand, remember, and carry out short and simple instructions and concentrate and attend for reasonable periods of time. Contrary to Plaintiff's argument, the mere use of the words "some" and "with supervision" does not make Dr. Tocci's opinions inconsistent with those of Dr. Duke. Furthermore, although Dr. Tocci opined that Plaintiff's prognosis was "guarded," no where in her report did she opine that Plaintiff was unable to work or that he had any limitations exceeding the ALJ's RFC

---

[12] Plaintiff does not appear to object to the ALJ's consideration of Dr. Hinton's opinions. In any event, the Court's discussion of the ALJ's consideration of the opinions of non-examining state agency medical and psychological consultants applies to Dr. Hinton as well.

assessment.

Likewise, Dr. Duke's opinions are consistent with Plaintiff's teacher's report. Although Ms. Tarver stated in her teacher report that Plaintiff has very serious problems with reading and comprehending written material and finishing his work on time, she also found that that Plaintiff has only a slight problem with comprehending oral instructions and focusing long enough to finish an assigned task and that he has no problems paying attention when spoken to directly, carrying out single step instructions, or interacting and relating with others. These opinions are consistent with Dr. Duke's opinions that Plaintiff is able to understand, remember, and carry out short and simple instructions and to concentrate and attend for reasonable periods of time. Thus, the ALJ did not err in affording Dr. Duke's opinions significant evidentiary weight.

Last, the Court notes that the evidence related to Plaintiff's activities of daily living is consistent with the opinions of each of the examining and non-examining physicians who evaluated Plaintiff. As discussed above, Plaintiff told Dr. Tocci at his examination in January 2009 that his daily activities include school, sitting around the house, playing card games alone, watching television, doing chores, driving, going to movies, going to church, fishing, and socializing with friends, all of which he performs without assistance. (Id. at 291). Plaintiff also stated at his administrative hearing in October 2010 and in his reports filed with the Agency that, while he cannot read or count change, he takes care of his own personal needs, does chores, hangs out with friends, drives, rides four-wheelers, and works on four-wheelers. (Id. at 52, 55, 225-26, 228-29, 254). This evidence supports Dr. Duke's opinions set forth above, as well as the ALJ's RFC assessment.

Accordingly, for each of the foregoing reasons, the Court finds that the ALJ's

determination that Plaintiff has the residual functional capacity to perform a range of work at all exertional levels (as long as that work is limited to understanding, remembering and carrying out simple one and two-step instructions on a frequent basis and only occasional interaction with the general public) is supported by substantial evidence and that Plaintiff's claim that the ALJ erred in affording significant weight to the opinions of non-examining psychologist, Dr. Duke is without merit.

### b. Whether the ALJ failed to pose an adequate hypothetical question to the vocational expert?

Plaintiff also argues that the ALJ erred in failing to pose a complete hypothetical question to the VE. (Doc. 13 at 3). Specifically, Plaintiff argues that the ALJ's hypothetical question to the VE was flawed in two respects: (1) it failed to account for Plaintiff's moderate limitation in concentration, persistence or pace and (2) the ALJ improperly asked the VE to consider specific DOT job titles suggested by the ALJ. (Id. at 4-6). The Government counters that the ALJ posed a hypothetical question to the VE that included all of Plaintiff's limitations and that there was nothing erroneous about the ALJ requesting that the VE evaluate specific DOT job titles. Defendant maintains that the ALJ properly relied on the VE's testimony and reasonably found that Plaintiff could perform work in the national economy. (Doc. 14 at 9-11).

The record shows that, at the administrative hearing conducted on October 13, 2010, the ALJ posed the following hypothetical question to the VE:

> [I]n the first hypothetical, I'd like you to assume a person who is . . . 21. And who has attended school in special education classes basically throughout his schooling history, and is functioning at the borderline intellectual level. And I'd like you to assume that he would have no past work experience. And in the first hypothetical, I'd like you to assume that he would have no exertional limitations but would be limited to understanding,

> remembering, and carrying out simple one- and two-step instructions on a frequent basis, and would be limited to only occasional interaction with the general public.
>
> And let me stop you there and ask whether you'd be able to identify any jobs in the regional or national economy that a person with that profile could perform.

(Tr. at 70).

In response to the hypothetical, the VE listed several occupations that were consistent with the hypothetical, each of which had an SVP level of 2. (Id. at 71). The ALJ then asked the VE, "[c]ould you identify any jobs that are at an SVP of 1 that would meet the hypothetical?" (Id.). The VE responded:

> Let's see. I can't really sort that way, but there [are] a number of different cleaners that are essentially industrial cleaners that fall at the SVP level of 1, at the medium level. One would be, say, a bus cleaner. That's DOT code 919-687.014. And I don't have the numbers on that. It looks like statewide there would be about 2,000 or 2,100 but I don't have the national numbers on that.

(Id.).

The ALJ then asked the VE, "[d]o you have with you a computer that would give you information about jobs that are in the Dictionary of Occupational Titles," to which the VE responded, "yes." (Id. at 72). The ALJ then questioned the VE about three specific DOT numbers, asking whether those particular jobs were consistent with the hypothetical that had been posed. (Id. at 72, 79). The VE testified that each of the DOT occupations suggested by the ALJ was consistent with the hypothetical. Specifically, the VE testified that DOT #526.687-010 corresponded with the job of "sorter," that it had an SVP of 1, that there were approximately 597,000 jobs nationally, and that the occupation met the criteria of the hypothetical given by the ALJ. (Id. at 72). Next, the VE testified that DOT #732.686-010 corresponded with the job of "medium-level sorter," that there were approximately 265,000

jobs nationally, and that the occupation met the criteria of the hypothetical given by the ALJ. (Id. at 72-73). Finally, the VE testified that DOT #409.686-010 corresponded with the job of "farm worker," that it had an SVP of 1, that there were approximately 240,000 nationally, and that the occupation met the criteria of the hypothetical given by the ALJ. (Id. at 79-80). Based on the VE's testimony, as well as "the totality of the credible evidence of record," the ALJ found that "considering the claimant's age, education, work experience, and residual functional capacity," he was capable of making a successful adjustment to other work that exists in significant numbers in the national economy" and, thus, he was not disabled. (Id. at 41).

Plaintiff argues that the ALJ's hypothetical question to the VE was flawed in the first instance because it failed to account for Plaintiff's moderate limitation in concentration, persistence or pace. Plaintiff is correct that, "[i]n order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." Neefe v. Commissioner of Soc. Sec., 531 Fed. Appx. 1006, 1007 (11th Cir. 2013) (unpublished) (quoting Winschel v. Commissioner of Soc. Sec., 631 F.3d 1176, 1180 (11th Cir. 2011)) (internal quotation marks omitted). However, "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations." Dailey v. Astrue, 2012 U.S. Dist. LEXIS 111357, *30, 2012 WL 3206482, *10 (S.D. Ala. 2012) (quoting Winschel, 631 F.3d at 1180). See also Neefe, 531 Fed. Appx. at 1007 ("Since the ALJ determined that the medical evidence demonstrated that Neefe could engage in simple tasks, despite moderate limitation[s] in concentration, persistence, and pace, the ALJ sufficiently accounted for such impairments, implicitly, by limiting the hypothetical that was

17

posed to the vocational expert to include only simple tasks or unskilled work.).”

In addressing Issue I above, the Court found that the substantial medical evidence in this case supports the ALJ's RFC determination that Plaintiff can engage in simple, routine tasks and unskilled work, despite his moderate limitation in concentration, persistence, and pace. By restricting the hypothetical question to unskilled work and work which would require no more than understanding, remembering, and carrying out simple one- and two- step instructions on a frequent basis and only occasional interaction with the general public, the ALJ sufficiently accounted for Plaintiff's moderate limitation in maintaining concentration, persistence, or pace[13] and satisfied the requirements for a hypothetical in this circuit.

The Court also rejects Plaintiff's argument that the ALJ erred because he asked the VE to consider whether specific DOT job numbers were consistent with the posed hypothetical. Plaintiff has cited no law in support of his argument that the ALJ's inquiry into specific DOT occupations, supplied by the ALJ, constituted error, nor has he shown how he was prejudiced by any such alleged error. Errors which do not prejudice the plaintiff and which would not change the disability determination are harmless. See generally Battle v. Astrue, 243 Fed. Appx. 514, 522 (11th Cir. 2007) (unpublished); Wright v. Barnhart, 153 Fed. Appx. 678, 684 (11th Cir. 2005). Accordingly, Plaintiff's argument is without merit.

**V.     Conclusion**

For the reasons set forth herein, and upon careful consideration of the administrative

---

[13] In addition to finding that Plaintiff has a moderate limitation in maintaining concentration, persistence, or pace, Dr. Duke also found that Plaintiff has a moderate limitation in maintaining social functioning. (Tr. 322). Although Plaintiff's argument is not directed at the latter limitation, the Court notes that the substantial medical evidence demonstrates that Plaintiff can engage in simple, routine tasks and unskilled work despite both of these moderate limitations, and the ALJ's hypothetical sufficiently accounted for both moderate limitations.

record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for child's insurance benefits and supplemental security income be **AFFIRMED.**

**DONE** this **17th** day of **March, 2014.**

                                                 /s/ **SONJA F. BIVINS**
                                        **UNITED STATES MAGISTRATE JUDGE**